Filed 9/30/16  ThyssenKrupp Elevator v. Occupational Safety and Health Appeals Bd. CA3
Received for posting 10/4/16

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THYSSENKRUPP ELEVATOR CORPORATION,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>OCCUPATIONAL SAFETY AND HEALTH APPEALS BOARD,<br><br>Defendant and Respondent;<br><br>DEPARTMENT OF INDUSTRIAL RELATIONS, DIVISION OF OCCUPATIONAL SAFETY AND HEALTH,<br><br>Real Party in Interest and Respondent. | C077115<br><br>(Super. Ct. No. 34-2013-80001456-CU-WM-GDS)<br><br>MODIFICATION OF OPINION UPON DENIAL OF PETITION FOR REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on August 31, 2016, be modified as follows:

1

1. On page 17, at the end of the first sentence in the paragraph following the heading "I *Standard of Review*," insert the following: "(See *In re Gal Concrete Const. Co.* (Cal. OSHA, Sept. 27, 1990, Nos. 89-R3D5-317, 318) 1990 CA OSHA App.Bd. LEXIS 3; see also *Barnes v. Chamberlain* (1983) 147 Cal.App.3d 762, 767 ["One seeking to be excluded from the sweep of the general statute must establish that the exception applies"].)" That paragraph will now read:

"The parties agree that at the administrative level, CalOSHA had the burden to prove a safety standard was violated, and ThyssenKrupp had the burden to prove any exceptions or affirmative defenses applied. (See *In re Gal Concrete Const. Co.* (Cal. OSHA, Sept. 27, 1990, Nos. 89-R3D5-317, 318) CA OSHA App.Bd. LEXIS 3; see also *Barnes v. Chamberlain* (1983) 147 Cal.App.3d 762, 767 ["One seeking to be excluded from the sweep of the general statute must establish that the exception applies"].) On appeal from the trial court's mandamus ruling, the appropriate standard of review is as follows:"

2. On page 25, at the end of the second paragraph following the sentence: "And, as ThyssenKrupp replies, an employer cannot violate an exception; it can only fail to satisfy it." A footnote is to be inserted which reads:

"**7**. In its rehearing petition, CalOSHA insists that failure of the workers to mechanically block the escalator provides a sufficient ground for the citation and that we have misconstrued the regulation as a matter of law by focusing on inadvertent movement. But the purpose of the regulation is to prevent any movement not necessary to effectuate the repairs. The record here shows that any mechanical block used would have prevented the workers from moving the escalator to test and effectuate the repairs. This is not like cases where a worker is injured because the machine is never shut down at the outset of the repair, or where part of a machine moves unexpectedly during repairs, injuring the worker."

3.      On page 27, at the end of the first full paragraph ending in "shows substantial evidence to support the Board's finding," a footnote is to be inserted which reads:

"**8**. CalOSHA's rehearing petition contends we have failed to apply the employer's burden to prove an exception or affirmative defense, by stating that CalOSHA did not show what more ThyssenKrupp could have done.  This is incorrect.  We have reviewed and summarized the record, which shows there is no substantial evidence to support the Board's finding, and that ThyssenKrupp's evidence established adequate training under the circumstances, that is, the evidence shows ThyssenKrupp met the exception."

4.      On page 28, at the end of the second full paragraph ending in "given the rules and training the men received," a footnote is to be inserted which reads:

"**10**. CalOSHA's rehearing petition points out that an employer's remedy for a perceived "burdensome" regulation is to seek to have it changed, or try to obtain a variance, not to fail to comply with it.  We agree.  (See *In re Hooker Industries, Inc.* (Cal. OSHA, Feb. 24, 1982, No. 77-525) CA OSHA App.Bd. Lexis 10; Lab. Code, § 143.)  But we do not use the term "burdensome" in our opinion in that sense; instead, we merely hold there is no substantial evidence that it was an accepted repair procedure to reinstall the missing step each time the tension was adjusted, only Weiss's unsupported suggestion to that effect.  In other words, we hold ThyssenKrupp did not fail to comply with the regulation, not that the regulation was so burdensome that ThyssenKrupp was excused from complying therewith."

The footnotes in the opinion must be renumbered to accommodate the footnotes inserted by this modification.

3

As modified, the petition for rehearing is denied.  This modification does not change the judgment.

FOR THE COURT:


_____/s/_____
ROBIE, Acting P. J.


_____/s/_____
MURRAY, J.


_____/s/_____
DUARTE, J.

Filed 8/31/16  ThyssenKrupp Elevator Corp. v. Occupational Safety and Health Appeals Bd. CA3 (unmodified version)

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THYSSENKRUPP ELEVATOR CORPORATION, | C077115 |
| Plaintiff and Appellant, | (Super. Ct. No. 34-2013-80001456-CU-WM-GDS) |
| v. | |
| OCCUPATIONAL SAFETY AND HEALTH APPEALS BOARD, | |
| Defendant and Respondent; | |
| DEPARTMENT OF INDUSTRIAL RELATIONS, DIVISION OF OCCUPATIONAL SAFETY AND HEALTH, | |
| Real Party in Interest and Respondent. | |

ThyssenKrupp Elevator Corporation (ThyssenKrupp) appeals from the denial of its mandamus petition to overturn three citations issued by real party in interest California Department of Industrial Relations, Division of Occupational Safety and Health

1

(CalOSHA), upheld by the California Occupational Safety and Health Appeals Board (Board). ThyssenKrupp was penalized $5,960 after an employee suffered a foot amputation while working on an escalator. We reverse with directions to grant the petition in part, for lack of substantial evidence that ThyssenKrupp committed two of the three violations.

## FACTUAL AND PROCEDURAL BACKGROUND

*Procedural Overview*

This appeal follows a decision by an administrative law judge (ALJ) after a hearing over three days, a partly successful reconsideration motion--in effect, an administrative appeal--to the Board, and a mandamus proceeding in the Superior Court.

As briefly summarized by the Board in denying ThyssenKrupp's reconsideration petition:

> "Two of [ThyssenKrupp's] employees were sent to a commercial office building in Sacramento, California to troubleshoot an escalator. In the course of their work they removed a step from the escalator and started [the escalator] to diagnose the problem, then stopped [it] again. One of the [workers] repaired the escalator by working through the gap created by the missing step. At the first worker's request, the other then walked up the escalator from the bottom to the upper landing to start the escalator. When he reached the top and leaned over to use the start switch his foot dropped into the gap formed by the removed step and when the escalator began moving a rising step amputated his foot."

We will provide a more detailed statement of the evidence, *post*.

Based on this event, CalOSHA issued three citations (counts) and separate monetary penalties against ThyssenKrupp, alleging violations of safety regulations as follows: 1) failure to provide written lockout/tagout procedures to de-energize the escalator, for which a penalty of $560 was assessed (Cal. Code Regs., tit. 8, § 3314, subd. (g)(2)(A));[1] 2) failure to lock out the machinery prior to servicing, for which a penalty of

---

[1] Further undesignated section references are to this title.

$5,400 was assessed (*id*., § 3314, subd. (c)); and 3) failure to guard mechanical pinch and shear points, for which a penalty of $18,000 was assessed (*id*., § 4002, subd. (a)). These counts and penalties were upheld by the ALJ.

On reconsideration by the Board, all three counts were affirmed. But because the Board found the hazard sought to be averted by the regulation supporting the third count was the same as that supporting the second, it deemed the penalty duplicative and the third count "less directly related"; thus the penalty for that count was zeroed out.[2]

ThyssenKrupp filed a mandamus petition, which the trial court denied after a hearing. ThyssenKrupp timely appealed from the ensuing judgment.

*The Administrative Hearing*

We first describe the pleaded issues, that is, the specific violations alleged by CalOSHA and ThyssenKrupp's administrative responses thereto. We detail the relevant regulations as necessary in the Discussion portion of our opinion, *post*.

Count 1--failure to provide specific written procedures--alleged ThyssenKrupp's written safety procedures did not "include separate procedural steps for the safe lockout/tagout of each machine or piece of equipment associated with the type of work the company does on escalators for its various clients." ThyssenKrupp administratively appealed, alleging it developed and implemented appropriate procedures, satisfied exceptions in the regulation, and that the cited regulation did not apply.

Count 2--failure to lock machine before servicing--alleged a ThyssenKrupp employee "was cleaning, repairing, and servicing an escalator . . . that was capable of movement. The escalator was not stopped and the power source not de-energized or

---

[2] As support for this ruling, the Board cited a prior Board decision holding in relevant part: "While multiple citations involving a single hazard are appropriate and typically will be upheld, the same is not true for duplicative *penalties*." (*In re Sherwood Mechanical, Inc*. (Cal. OSHA, June 28, 2012, Nos. 08-R3D2-4692, 4963) 2012 CA OSHA App.Bd. Lexis 65, italics added.)

3

disengaged and, if necessary, the moveable parts were not mechanically blocked or locked out to prevent inadvertent movement resulting in the employee sustaining a serious injury." ThyssenKrupp replied in part that an unforeseeable employee act caused the injury, the cited regulation did not apply, and if it did apply, ThyssenKrupp either complied with it or satisfied an exception, and "[c]ompliance would have made the work impossible."

Count 3--failure to guard pinch and shear points--alleged in part that an "escalator step was removed to expose parts of the escalator or components of the escalator and upon removing the step, exposed the employee to a hazardous revolving, running, drawing, or similar act including shear points that [were] not guarded by the frame of the machine or location." ThyssenKrupp's response in relevant part alleged the cited standard did not apply.

*Evidence at the Administrative Hearing*

The parties stipulated that the accident occurred on April 13, 2011, in a building at 2901 K Street in Sacramento. This was referred to in the record as the UC Davis or Sutter Square Galleria.

*Joshua Harrell*

Joshua Harrell testified he was an "80 percent mechanic" with nearly five years of experience with ThyssenKrupp, and that he and Steve Moore, a mechanic with whom Harrell had worked for nearly three years, were sent to investigate a noisy handrail that was running hot. Harrell testified Moore was senior to him and he was the helper, but also testified that Moore was not his supervisor. Harrell had passed the necessary tests to be a mechanic, but had agreed via his union to be treated as an assistant mechanic. The escalator was not running when they arrived, but the men heard the noise when they ran it. There are two red panic buttons, one at the bottom landing and one at the top landing, and one stop switch at the bottom. The panic switch is "momentary" but the "stop switch keeps it from coming back on, electrically" until a key is used. Moore had a variety of

4

such keys, and by trial-and-error found one that worked; there is no master key that works on all escalators. A key will not stop an escalator, it can only start it. Moore rode the escalator to diagnose the problem. The men got their tools, then barricaded the top and bottom of the escalator. They partly removed a handrail on the side making noise, but found nothing wrong and, after cleaning it, put it back on.

Moore turned the escalator back on, using his key on the top, to see whether the problem was fixed; it wasn't. They turned it off, went back to the bottom, and removed the bottom pit access cover, and removed one of the steps. The men then ran the escalator until Moore thought he could hear where the noise was coming from, riding two or three steps behind--meaning below--the gap, where he could see the moving parts to determine what was wrong. When Moore told Harrell the stairs were where he wanted them, Harrell used a stop switch in the pit to shut off the escalator. The men each made adjustments to what Harrell described as a handrail tensioning device, located under the steps. They did this several times, turning the escalator on in between, while the men stood on the landing to see if the problem was fixed, and using the panic button at the top and then the stop switch at the bottom to turn the escalator off before re-adjusting the unit. It is possible to stop the escalator with the panic button alone, and adjust it, but it is not safe to do so. The stop switch, once used, must be manually pulled out, otherwise the key switch will not restart the escalator. Once the stop switch is used, no movement is possible, barring a freak malfunction.

The men thought they had largely solved the problem, took a lunch break, then returned and ran the escalator so Moore could ensure it was fixed. Harrell went to the lower pit, removed tools from the steps, walked up, and used the key switch to turn the escalator on. As he was close to the upper landing, he bent down to turn the key switch. Harrell does not remember the accident itself. He remembers stepping over the gap, bending down with his back toward the escalator, and turning it on.

When an escalator is used normally, the internal components pose no hazard, as they are covered by steps. Harrell and Moore had removed steps to repair escalators before, and it was necessary to move the escalator to diagnose or repair the problem. No guard over the gap is used.

Harrell identified ThyssenKrupp's escalator safety practices. One rule provides: "<u>NEVER</u> start, or attempt to start a unit while anyone is on or in the unit." Harrell testified he had been trained on that rule and considered it "common sense." He also understood a written rule providing: "When any steps . . . are removed, <u>ALWAYS</u> work, and ONLY if necessary, ride below the opening." He testified the purpose of this rule was to keep the gap in front to see where it is going, so "you're not slipping in the hole that's behind you. You're able to step away from it and over it." Although the written escalator practices do not mention Hitachi escalators, in Harrell's view "they applied to almost every escalator" and there was nothing about the Hitachi escalator he was working on that was unique or contributed to the accident. However, the location of the switches differs by brand of escalator.

Harrell testified that if--as seems likely--his foot had been on the top escalator step when he started the escalator, he violated ThyssenKrupp's safety rules. His feet should have been on the landing when he turned the switch. He identified ThyssenKrupp's lockout/tagout procedures, on which he had been trained.

*Jon Weiss*

Jon Weiss, the Sacramento District Manager for CalOSHA enforcement and a safety engineer, testified ThyssenKrupp's lockout procedures, which referenced federal regulations, were "extremely general and California requires you have specific lockout procedures for each piece of equipment or processor[] and I didn't see there was anything, one that spoke to escalators -- in particular to the Hitachi escalator that's the center of this case." In his view, ThyssenKrupp could rewrite the procedures to take into account all the various types of equipment or could combine "similar escalators that were

6

identical." Otherwise, even if there were thousands of different makes and models, Weiss would expect separate procedures for each. However, he had not researched whether any company actually does that, although he had spoken to Michael Boyle, in CalOSHA's elevator unit about this case. In particular, he did not ask Boyle whether the escalator regulatory code for California requires escalators regardless of make and model to have disconnects that operate the same way. He also testified that with the step removed, the escalator created a shearing hazard. The zone of danger from moving parts is generally considered to be about six feet, and Harrell's foot was within this zone before the accident. Regarding count 2--failure to lock machinery--Weiss testified that a proper lockout/tagout required the workers "to put a tag as well as secure the energy source" and tags should have been put "at both the upper and lower locations." Weiss testified the escalator could have been guarded by replacing the step or by using a clear glass or plastic step to cover the opening. However, he conceded he did not know if such a guard existed, in any form. When the step is in place, there is no mechanical pinch point that presents a danger. He added that ThyssenKrupp could have put up gates to block access to the opening.

Weiss had never worked in the elevator or escalator industry and had no background in the repair of such machines, but he had investigated one or two elevator accidents. He did not compare ThyssenKrupp's lockout/tagout procedures with any others used in the industry. He agreed the workers required power to the escalator to work on it. Weiss conceded ThyssenKrupp had not been faulted for any failure of training on lockout/tagout procedures. There was nothing preventing Harrell from standing on the landing--a safe location--before Harrell turned the key switch.

*Steve Moore*

Moore testified he has about 31 years of experience with elevator/escalator repair companies. He has worked on Hitachi escalators before. He did not consider himself Harrell's supervisor, but testified that on the day of the accident he was the mechanic and

7

Harrell was assisting him. There was nothing unusual about the repair job, which involved a "popping noise," which Moore knew was the drive chain and which required removing a step to fix. This was a common type of repair that he and Harrell had done before. He knew of no extant replacement step that could have been used during the repairs, nor was it feasible to replace the actual step in between each adjustment. Once the step was removed, it was necessary to move the escalator to diagnose the problem. The only way to move it was with the key switch, and the men had one key for that escalator. When the drive chain, located at the upper end, is actually being adjusted, the escalator is not moving. However, the escalator needs to move to spot the problem. Once the gap from the removed step was in the right place to allow access to the drive chain, the men would lock out the power with a company lock at the upper switch. When Moore rides an escalator with a missing step, he rides "a minimum two steps behind the hole."

The men completed working on the drive chain before lunch, and after lunch Moore decided to see if the handrail would heat up again. Moore told Harrell to run the unit, because it would take time to heat up. Moore then saw that Harrell's posture was "funny" and that he had his hand on the key, and Moore tried to say "no" but the escalator started, "his foot went in there," and Moore rushed to the stop switch. Harrell's "foot was like half on that exposed step and half on the comb segment." Harrell must have told Moore that the lower stop switch was on, or Moore would not have told him to start the unit while the men were at the top. The escalator could not have moved as Harrell stepped over the gap; Harrell had to have turned the key switch.

ThyssenKrupp regularly trains its employees on its safety manual and audits job sites to ensure workers are acting safely. Workers can be disciplined for violating the rules. Moore had been trained on the rules against standing on an escalator when it is starting, and the need to ride below an open step.

In Moore's experience, all lockout/tagout procedures are very similar and are effective on the escalators he works on. California safety codes require that escalator disconnects function similarly regardless of the type of escalator, and are easy to locate; the steps to perform a lockout/tagout are the same. Activation of the disconnect shuts down the main power source for the motor, leaving no residual energy in the escalator.

In Moore's opinion, Harrell's foot was in the wrong place.

*David Nicholson*

David Nicholson was a ThyssenKrupp employee who had worked in the escalator repair field for 23 years, and was a state-certified mechanic. He described ThyssenKrupp's safety training program. It is common to remove steps to service an escalator, and this usually requires exposing the internal mechanism. He had reviewed witness statements and the CalOSHA file on this accident. To resolve the reported handrail problem, a step would be removed to access the handrail drive chain to adjust it. ThyssenKrupp's safety rules are consistent with industry standards. Nicholson knew of no guard that can be installed to cover a removed step, nor would it be possible to make one and still operate the escalator. If there were a "see-through" step--which there isn't-- it would have to mimic the removed step exactly. When a stop switch is activated, the key switch will not work. The only way to position the gap is to remove the step from the bottom, and ride below the gap to spot the handrail drive mechanism. After the stop switch is used there is no possibility of escalator movement, even when stepping over the gap.

Placing a foot where Harrell evidently did violated ThyssenKrupp's safety rules and is something Nicholson would never do; instead, a worker should stand on the landing. Further, the gap should always be kept in front of the worker.

ThyssenKrupp's lockout/tagout procedures are effective on every make and model of escalator because all the disconnects are the same on every unit and "pretty much in the same place" and they function similarly. All escalators have a single energy supply

9

that is readily identifiable. Different models may have different configurations of drives, but the disconnect switches could be found in the same place, the upper pit, and all operate in the same way. He conceded that *within the pit* the disconnect could be located in different places. On all kinds of escalators, once the disconnect switch is used, no energy is stored in the machine. The sequence of locking out an escalator is the same regardless of make and model. Nicholson knew of no company that used separate procedures for different escalators, nor would it be feasible to carry around such a compilation.

Nicholson would have turned the escalator on from the bottom rather than the top.

*George Karosas*

George Karosas, a licensed professional engineer, testified as an engineering and workplace safety expert for ThyssenKrupp, specifically, on the areas of "control of hazardous energy, machine guarding, and safety engineering."

Karosas reviewed ThyssenKrupp's hazardous energy control procedures, as well as a national standards manual, and prepared a report on his findings. His report concluded the accident occurred because Harrell placed one foot partly on the top step of the escalator (rather than on the landing) while he activated the key switch, such that when his foot slipped, it went down into the gap and was "trapped . . . at the comb plate."

Karosas's report states that "[w]hile escalators vary in features such as length and width, capacity and appearance, the design of the equipment is very similar. An escalator is a power-driven, continuously moving, inclined stairway. It consists of an endless chain of moving steps driven by a motor. The motor turns the main drive shaft, which powers the step chain(s) to move the steps in an endless loop. The escalator steps are actually wedge-shaped units that move along a continuous conveyor." The report adds that all escalators in the United States and Canada must comply with standards promulgated by the American Society of Mechanical Engineers (ASME), specifically, ASME A17.1 Safety Code for Elevators and Escalators, which further requires escalators to be installed

10

according to NFPA, the National Electric Code. He testified that that national electrical code "establishes common design and operational characteristics of electrical disconnects so that the procedural steps to de-energize are similar for that class or group of machinery" and therefore any differences the Hitachi escalator had from any other escalator were immaterial to anyone working on the unit. It would not be feasible "and likely would be impossible" for a company to have specific procedures for every type of escalator. He opined count 1--alleging inadequate lockout/tagout procedures--was inappropriate for this reason.

According to Karosas, Harrell had ample room to position himself safely on the landing before turning on the escalator, and simply failed to adhere to the training on this subject he had been given, therefore the count 2 citation--alleging failure to lock machinery--was inappropriate. Placing a temporary step was not feasible.

Karosas opined the count 3 citation--alleging failure to guard pinch and shear points--was inappropriate because the cited regulation does not apply to equipment being serviced, and the escalator had all appropriate safety devices for use during normal operation.

### *Robert Brandley*

Robert Brandley, ThyssenKrupp's West Region Safety Manager (covering California and Nevada) had started as a field mechanic, installing, servicing, and repairing, elevators, lifts, and dumbwaiters. The afternoon of the accident he flew in from Burbank and took statements from Harrell and Moore. There was no reason for Harrell to have his foot on the top step before starting the escalator. Brandley had presented an escalator safety class that Harrell had attended, covering rules about not working on or around moving equipment, and riding behind an opening. He identified documents showing Harrell had attended various safety classes before the accident.

Harrell violated company policy both by having his foot in an unsafe place and not having the gap in front of him, where he could see it. Harrell was given formal written discipline for his actions and did not contest the discipline through available procedures, but instead accepted the discipline; nor did Harrell's union grieve the discipline, as it might have done. On the day of the accident, Harrell, referring to "body placement and so on," told Brandley he had "screwed up" and was sorry. Brandley described the disciplinary system ThyssenKrupp uses to ensure employees follow safety rules, and authenticated documents showing internal safety citations given to employees for various breaches. Harrell had been to training classes that included lockout/tagout procedures, and Brandley authenticated records corroborating his testimony.

In Brandley's view, although there are different brands of escalators, both as to the escalators and their power disconnects, their design and functionality all operate the same. This is due to state and federal regulations governing escalators and elevators. However, Brandley conceded that different types of equipment are not installed the same way, and agreed there is the "potential for different equipment" in different escalators.

According to ThyssenKrupp procedures, if a step is removed, it should be kept in front of the worker so the gap can be seen. If movement is necessary, the worker must stand below the gap. These procedures were not in the lockout/tagout section of the safety manual, Exhibit F, but in a separate section subtitled "Escalators and Moving Walks," Exhibit E, which states equipment should never be started "while anyone is on or in the unit" and that if any steps are removed, *if* it is necessary to ride on the unit, "ride below the opening."

*The ALJ's Findings*

As for count 1--failure to provide specific written lockout/tagout procedures--the ALJ found ThyssenKrupp's lockout/tagout procedure manual "does not use the word 'escalator' anywhere in the document. The word 'elevator' is used three times. This is not a procedure for **each** machine, as it is for both escalator and elevator lockout/tagout

12

procedure. Rather, it is a procedure for two different groups of machines, specifically escalators and elevators." Further, ThyssenKrupp did not meet its burden to show that the first exception to the regulation, that the operational controls are configured in a similar manner and locations of disconnect points are identified, applied both because there is no discussion how operational controls are configured and there is no indication of the locations of disconnect points. Nor did ThyssenKrupp establish the second exception, applicable where the machinery has a single energy supply that is readily identified and isolated, because such an interpretation of the exception would make "the exception meaningless. Any machine with a single energy source would qualify. The construction which gives the exception meaning is that all of the group or type of machines . . . must have a single readily identified and isolated energy supply" and a "group of escalators at different location[s] would have multiple energy sources, generally one for each escalator. [¶] Expert testimony was offered that all escalators have power disconnects located in the pits at their top landings but this information is not contained in" the ThyssenKrupp procedure manual. The ALJ quoted a prior Board decision, providing in part that "[i]t would make little sense and would not afford meaningful employee protection to interpret the safety order as simply allowing a *generalized* outline which does not specify (or purports to apply to all) machinery or equipment on which employees would [work]." (*In re Eel River Sawmill* (Cal. OSHA, Sept. 3, 2003, No. 00-R2D3-3623, 2003) CA OSHA App.Bd. Lexis 95.)

As for count 2--failure to lock out the machinery prior to servicing--the ALJ found machinery capable of movement had not been de-energized, blocked, or locked out, so as to prevent movement during servicing. In the ALJ's view, the lack of sufficiently specific lockout/tagout procedures (i.e., the purported count 1 violation) *caused* Harrell to start the machine while he was in a "zone of danger, which he would not have been in" had ThyssenKrupp's procedures been adequate. Due to the purported lack of adequate

13

procedures, ThyssenKrupp could not establish its defense of "independent" employee action.**3**

As for count 3--failure to guard mechanical pinch and shear points--the ALJ found ThyssenKrupp violated a rule precluding removal of guards (i.e., the step) to protect against machinery, and rejected ThyssenKrupp's claim that training was sufficient to guard against this danger.

*The Board's Decision on Reconsideration*

The Board upheld the bulk of the ALJ's findings.

As for count 1, alleging lack of specific procedures, the Board rejected ThyssenKrupp's claims that all escalators have the same basic layout as required by California escalator codes, and instead found that "[e]levators and escalators were not shown to have sufficient similarity" to satisfy the first exception to the safety rule, nor was there a sufficient "showing that both types of machines have the same layouts of power sources, cutoffs, and so on. Thus, even if all escalators are the same, [ThyssenKrupp's] procedure was faulty because it applied to mechanisms other than escalators." The Board also rejected ThyssenKrupp's assertion that training was an adequate substitute for appropriate procedures, because "[t]here is no mention in the

---

**3** That defense requires an employer to show " '1. The employee was experienced in the job being performed, [¶] 2. Employer has a well-devised safety program which includes training employees in matters of safety respective to their particular job assignments, [¶] 3. Employer effectively enforces the safety program, [¶] 4. Employer has a policy which it enforces of sanctions against employees who violate the safety program, and [¶] 5. The employee caused a safety infraction which he or she knew was contra to the Employer's safety requirement.' " (*Davey Tree Surgery Co. v. Occupational Safety & Health Appeals Bd.* (1985) 167 Cal.App.3d 1232, 1239 (*Davey*); see *Gaehwiler v. Occupational Safety & Health Appeals Bd.* (1983) 141 Cal.App.3d 1041, 1044-1045; *In re Sacramento Bag Mfg. Co.* (Cal. OSHA, Dec. 11, 1992, No. 91-R2D1-320) CA OSHA App.Bd. Lexis 9.)

14

safety order of training as a means of complying with or as a substitute for having lockout/tagout procedures."

As for count 2, alleging failure to lockout, the Board rejected ThyssenKrupp's claim the machinery needed to be moving during servicing, because there was no evidence ThyssenKrupp provided suitable alternatives (such as extension tools) to allow the workers to service the machine safely without the guard (the step) in place. The Board also rejected ThyssenKrupp's claim that training was an adequate substitute, and the accident was caused by Harrell's violation of adequate training, given that Harrell "was positioned above the gap created by the removed step, rather than below it, as was the appropriate practice." The Board twice referenced Harrell's *violation* of training, but did not identify specific defects in the training, instead finding "[t]he evidence did not provide sufficient detail" about the training.[4]

As for count 3, alleging failure to guard, the Board rejected ThyssenKrupp's contention that the rule in question applied to and only to machinery in its normal running condition, not machinery that was being repaired. The Board rejected ThyssenKrupp's claim that it had no reason to know Harrell would violate safety procedures, because ThyssenKrupp's "failure to provide an adequate lockout/tagout procedure, by itself, created the hazard of injury." However, the Board agreed with ThyssenKrupp that the hazard addressed by the rule breached in count 3 (an employee's body contacting a moving piece of machinery) was the same hazard addressed by the rule breached in count 2 (preventing machinery from moving or providing extension tools to prevent an employee's body from contacting a moving piece of machinery) and therefore the penalty for violating count 3 should be reduced to zero. "In this matter, the hazard

---

[4] The Board also rejected an interpretive claim about the regulation that ThyssenKrupp does not press on appeal; therefore, we do not discuss it.

could have been abated by making certain both employees were out of harm's way before re-starting the escalator, a procedure or step consistent with lockout/tagout."

At this point in its decision, the Board inserted a footnote stating that "for purposes of penalty correction," the Board accepted ThyssenKrupp's evidence that there "is no means to guard the gap created by removing a stair."

*Ruling Denying Mandamus Relief*

The trial court denied ThyssenKrupp's mandamus petition, finding ThyssenKrupp did not show the Board misapplied the law or that no substantial evidence supported the Board's decision.

As for count 1, the trial court rejected ThyssenKrupp's view that it had a "master" lockout/tagout procedure that qualified under the exceptions to the regulation. Both "conditions," or exceptions to the regulation required that there be "a group or type of machinery or equipment" (§ 3314, subd. (g)(2)(A); see part III Discussion *post*), but ThyssenKrupp had "not shown that escalators and elevators are a 'group or type of machinery' " as contemplated. The court observed that "these two types of machines differ greatly and their operational controls may *not* be configured in a similar manner" and at best ThyssenKrupp showed that all types of escalators had similar operational controls.

As for count 2, which addresses "inadvertent" movement by requiring equipment to be locked before servicing (§ 3314, subd. (c); see part IV Discussion *post*), the trial court rejected ThyssenKrupp's claim that the machinery was intentionally moved as part of the repair process. The court further held that ThyssenKrupp did not satisfy its duty to minimize the hazard (§ 3314, subd. (c)(1)) because its evidence of employee training was insufficiently detailed, and because ThyssenKrupp's lockout/tagout manual was deficient, as shown by the count 1 violation: "The ALJ concluded that the absence of 'guidance' included in a proper lock-out/tag-out procedure resulted in Harrell re-starting the escalator while too close to the open escalator step."

16

As for count 3, the trial court rejected ThyssenKrupp's contention that the regulation at issue, which pertained to the removal of steps which resulted in exposing machinery (§ 4002, subd. (a), see part V Discussion *post*), did not apply to machinery being repaired.

Accordingly, the trial court denied ThyssenKrupp's petition in its entirety.

ThyssenKrupp timely filed its notice of appeal from the ensuing judgment.

## DISCUSSION

### I

### *Standard of Review*

The parties agree that at the administrative level, CalOSHA had the burden to prove a safety standard was violated, and ThyssenKrupp had the burden to prove any exceptions or affirmative defenses applied. On appeal from the trial court's mandamus ruling, the appropriate standard of review is as follows:

> " 'Our function on appeal is the same as that of the trial court in ruling on the petition for the writ. We must determine whether based on the entire record the Board's decision is supported by substantial evidence and whether it is reasonable. [Citations.] Where the decision involves the interpretation and application of existing regulations, we must determine whether the administrative agency applied the proper legal standard. [Citation.] Since the interpretation of a regulation is a question of law, while the administrative agency's interpretation is entitled to great weight, the ultimate resolution of the legal question rests with the courts. . . . An agency's expertise with regard to a statute or regulation it is charged with enforcing entitles its interpretation of the statute or regulation to be given great weight unless it is clearly erroneous or unauthorized. . . . However, '[a]n administrative agency cannot alter or enlarge the legislation, and an erroneous administrative construction does not govern the court's interpretation of the statute.' " (*Rick's Electric, Inc. v. Occupational Safety & Health Appeals Bd.* (2000) 80 Cal.App.4th 1023, 1033-1034 (*Rick's Electric*).)

By statute, a court may not disturb a Board decision unless, inter alia, it is not supported by substantial evidence. (Lab. Code, § 6629, subd. (d).) "In reviewing the Board's factual determinations, both the trial court and this court apply the familiar substantial evidence rule. [Citations.] We view the evidence in a light most favorable to

17

the Board's decision, drawing all reasonable inferences and resolving all conflicts in the evidence in favor of the decision." (*Teichert Construction v. California Occupational Safety & Health Appeals Bd.* (2006) 140 Cal.App.4th 883, 887-888.) "So long as the whole record so viewed reveals in support of the judgment evidence of ponderable legal significance, i.e., evidence which is reasonable, credible, and of solid value, we must affirm." (*Gaehwiler, supra,* 141 Cal.App.3d at p. 1045, fn. 2.)

Substantial evidence " ' "reasonably inspires confidence" ' . . . and is 'credible and of solid value.' " (*People v. Raley* (1992) 2 Cal.4th 870, 891.) Although inferences may constitute substantial evidence, they must be the probable outcome of logic applied to direct evidence; speculative possibilities or conjecture are insufficient. (See *Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633; *Louis & Diederich, Inc. v. Cambridge European Imports, Inc.* (1987) 189 Cal.App.3d 1574, 1584-1585.) Nor does disbelief of a witness entitle a trier of fact to infer the opposite of the disbelieved testimony. (See *Estate of Kilborn* (1912) 162 Cal. 4, 13; *Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1204-1205.)

II

*Disregard of Prior Administrative Decisions*

ThyssenKrupp contends the trial court committed reversible error because it did not consider prior Board decisions in ruling on ThyssenKrupp's mandamus petition.

The trial court declined to consider the Board's prior decisions--cited by both ThyssenKrupp and CalOSHA in the trial court--because no copies had been lodged with the court, no pinpoint citations to relevant portions were provided, and their precedential value had not been explained; later the trial court suggested that a request for judicial notice of the prior Board decisions should have been sought.

We find no error. Instead of merely citing them in moving papers, ThyssenKrupp could have provided the trial court with copies of relevant administrative decisions. (See Cal. Rules of Court, rule 3.1113(i)(1) [format for presenting nonstandard authorities].)

18

Or, as the trial court suggested, ThyssenKrupp could have sought judicial notice of them. (See Evid. Code, § 452, subd. (c); *United Assn. Local Union 246, AFL-CIO v. Occupational Safety & Health Appeals Bd.* (2011) 199 Cal.App.4th 273, 278-279 & fn. 5.)

We do note, however, that California courts, including this court and our Supreme Court, routinely cite Board decisions to show prior Board interpretations of relevant safety regulations. (See, e.g., *Elsner v. Uveges* (2004) 34 Cal.4th 915, 930; *Rick's Electric*, *supra*, 80 Cal.App.4th at pp. 1034, 1037; *Overaa Construction v. CA Occupational Safety & Health Appeals Bd.* (2007) 147 Cal.App.4th 235, 241, 247, fn. 18; *Davey*, *supra*, 167 Cal.App.3d at pp. 1241-1242.) But the fact that the prior Board decisions were permissible authorities for the trial court to consider does not change the fact that ThyssenKrupp did not either lodge them with the court or seek judicial notice of them. We cannot say it was error for the trial court to insist on being provided with nonstandard authorities cited to it.

Further, even if we were to find the trial court's refusal to consider prior Board decisions amounted to an abuse of discretion, the error would not compel reversal because ThyssenKrupp does not explain how it was prejudiced by the trial court's ruling. It does not even cite the particular decisions which the trial court declined to consider in this portion of its briefing, so we have no occasion to consider whether, in fact, they were relevant and persuasive on the issues discussed. Accordingly, we turn to ThyssenKrupp's substantive claims of error.

## III

### *Lack of Adequate Lockout/Tagout Procedures*

Count 1 cited ThyssenKrupp for violating section 3314, subd. (g)(2)(A), in that ThyssenKrupp's safety procedures did not "include separate procedural steps for the safe lockout/tagout of each machine or piece of equipment associated with the type of work the company does on escalators for its various clients." The regulation begins as follows:

19

"A hazardous energy control procedure shall be developed and utilized by the employer when employees are engaged in the cleaning, repairing, servicing, setting-up or adjusting of prime movers, machinery and equipment." (§ 3314, subd. (g).) It continues: "The employer's hazardous energy control procedures shall be documented in writing. [¶] (A) The employer's hazardous energy control procedure shall include separate procedural steps for the safe lockout/tagout of each machine or piece of equipment affected by the hazardous energy control procedure." (§ 3314, subd. (g)(2)(A).)

The men were working on a Hitachi escalator. ThyssenKrupp's written lockout/tagout procedures manual refers to elevators, not escalators. Under CalOSHA regulations, both escalators and elevators are considered "conveyances," or "[a]ny elevator, dumbwaiter, escalator . . . or other equipment subject to this chapter." (§ 3009.) However, the basic definition of an elevator is: "A hoisting and lowering mechanism which moves a car or platform in fixed guides in, a substantially vertical direction and which is designed to carry passengers or freight, or both, between two or more fixed landings." (*Ibid.*) The basic definition of an escalator is: "A moving, inclined, continuous stairway used for raising or lowering passengers." (*Ibid.*) Thus, the two types of conveyance machines are not the same under the regulations.

Thus, it was necessary for ThyssenKrupp to demonstrate that a regulatory exception to the safety rule applied. The regulation provides:

"Exception to subsection (g)(2)(A): The procedural steps for the safe lockout/tagout of prime movers, machinery or equipment may be used for *a group or type of machinery or equipment*, when either of the following two conditions exist:

"(1) Condition 1:

"(A) The operational controls named in the procedural steps are configured in a similar manner, and

"(B) The locations of disconnect points (energy isolating devices) are identified, and

20

"(C) The sequence of steps to safely lockout or tagout the machinery or equipment are similar.

"(2) Condition 2: The machinery or equipment has a single energy supply that is readily identified and isolated and has no stored or residual hazardous energy."  (§ 3314, subd. (g)(2)(A), italics added.)

As indicated in the italicized portion and as emphasized by the Board and by CalOSHA on appeal, both conditions may apply only to "a group or type of machinery or equipment."  The Board found ThyssenKrupp failed to carry its burden of proof on this element of both exceptions because "[e]levators and escalators were not shown to have sufficient similarity."

We accept that ThyssenKrupp introduced substantial--perhaps even uncontradicted--evidence that all *escalators* are configured in materially the same way, regardless of make or model, because of standardized codes applicable in California and that no company in the industry creates separate procedures manuals for each escalator. But even if the electronic controls of all *escalators* are configured in materially the same way, this fact does not demonstrate the similarity between *escalator* and *elevator* control systems.  The Board found that ThyssenKrupp's procedures, Exhibit F, "covered both elevators and escalators, and there was no showing that both types of machines have the same layouts of power sources, cutoffs, and so on.  Thus, even if all escalators are the same, [ThyssenKrupp's] procedure was faulty."

To refute this point, ThyssenKrupp asserts in its opening brief that, as to escalators and elevators, "the rules for one are the same as the rules for the other."  However, because no record citation follows this assertion, we disregard it.  (See *Duarte v. Chino Community Hospital* (1999) 72 Cal.App.4th 849, 856.)  Later in its brief ThyssenKrupp asserts escalators and elevators "have the same operational controls in the form of a code-required disconnect."  ThyssenKrupp cites to what appear to be certain industry standards, and later provides a citation to "2 AR 40" to support this proposition.  The

21

referenced portion of the record is to a report by Karosas, with no pinpoint citation provided. Although it in part asserts that there are uniform standards "so that the procedural steps to de-energize are similar for that class or group of machinery," the Board was not required to accept that this meant ThyssenKrupp's generic *elevator* procedures applied equally to *escalators.* Indeed, Brandley himself testified escalators and elevators were "two different types of equipment" with different methods of installation and with different mechanisms, with the possibility of disconnects in different locations.

Because it was ThyssenKrupp's burden to show that its lockout procedures manual--facially applicable only to elevators--*also* applied to escalators, it was incumbent on ThyssenKrupp to produce evidence showing that the control systems for both types of machines were the same, or at least materially similar. Putting aside the fact that the Board was free to reject evidence, even if uncontradicted (see *Hicks v. Reis* (1943) 21 Cal.2d 654, 659-660), given ThyssenKrupp's failure to cite evidence in the record establishing that all escalators *and* elevators have similar controls, we cannot say the Board erred in finding ThyssenKrupp did not provide its employees with an adequate lockout manual.

We therefore agree with the Board that the record does not compel a finding that ThyssenKrupp carried its burden to demonstrate that either exception to general safety regulation applies to the machinery at issue in this case.[5]

---

[5] Contrary to an implication in ThyssenKrupp's briefing, this does not compel a separate manual for every make, model, and installation, of every escalator. If there are groups of similar escalators, or if all escalators are configured similarly, a single procedure could be drafted to apply to each group or to all escalators. Or, as ThyssenKrupp asserts, if all escalators are similar to all elevators, that could be explained in its manual.

IV

*Preventing Machine Movement*

Count 2 cited ThyssenKrupp for an alleged violation of the following regulation:

"Machinery or equipment capable of movement shall be stopped and the power source de-energized or disengaged, and, if necessary, the moveable parts shall be mechanically blocked or locked out *to prevent inadvertent movement*, or release of stored energy during cleaning, servicing and adjusting operations. Accident prevention signs or tags or both shall be placed on the controls of the power source of the machinery or equipment." (§ 3314, subd. (c), italics added.)

Subdivision (1) of that regulation provides:

"If the machinery or equipment must be capable of movement during this period in order to perform the specific task, the employer shall minimize the hazard by providing and requiring the use of extension tools (eg., extended swabs, brushes, scrapers) or other methods or means to protect employees from injury due to such movement. Employees shall be made familiar with the safe use and maintenance of such tools, methods or means, by thorough training."

The citation alleged that a ThyssenKrupp employee "was cleaning, repairing, and servicing an escalator . . . that was capable of movement. The escalator was not stopped and the power source not de-energized or disengaged and, if necessary, the moveable parts were not mechanically blocked or locked out to prevent inadvertent movement resulting in the employee sustaining a serious injury."[6]

The Board found: "Even assuming the movement of the escalator . . . was intentional and necessary, there was no evidence that [ThyssenKrupp] provided extension tools or other means to protect its employees. Further, despite the training claims [ThyssenKrupp] made, the injured employee was position above the gap created by the removed step, rather than below it, as was the appropriate practice." "The evidence did not provide sufficient detail about [ThyssenKrupp's] training . . . to conclude that such

---

[6] As ThyssenKrupp points out, although Weiss mentioned a lack of tags, such lack was not included in the citation, and is not relevant.

23

training amounted to 'other method or means to protect employees from injury.' And even if the injured employee had been trained about where to stand in relation to the gap created by the removed stair, he did not heed that training." However, in another section of the Board's decision, addressing count 3, the Board found "the escalator was operating at the time of the injury, *and was set in motion deliberately*." (Italics added.)

On appeal, ThyssenKrupp contends the record shows that at the time of the accident, the escalator was incapable of inadvertent movement and had "no stored energy," therefore this regulation was not violated. ThyssenKrupp also contends that its employees had "other methods or means" (§ 3314, subd. (c)(1)) to ensure they were protected, and this fact, too, negates the citation. We agree with both points.

The regulation requires procedures "to prevent inadvertent movement" of machinery. (§ 3314, subd. (c).) However, as the Board conceded at one point, no inadvertent movement occurred. The men had only one key that would fit this escalator. They used a stop switch to disconnect the power when necessary, and used the key switch to re-energize the escalator when appropriate, as repairs were made to the drive train. There is no evidence that at any time the escalator moved inadvertently that day.

At the moment of the accident, Moore was safely on the upper landing of the escalator. Harrell, however, apparently had one foot on the top step of the escalator, evidently a step above the "gap" caused by the removed step. Harrell then used the key with the explicit intention to re-energize the escalator, despite the fact that both of his feet were not safely on the landing. One foot was instead on the top step of the escalator. This foot went into the gap once he intentionally re-started the escalator.

We reject CalOSHA's argument that the regulation would apply even in the absence of inadvertent movement. CalOSHA's reasoning is as follows:

24

"While Appellant's opening brief focuses on the words 'inadvertent movement, or release of stored energy,' Appellant's analysis fails to recognize that those words apply only to the second phrase of Section 3314(c)'s mandate, which requires moveable parts to be '*mechanically* blocked or locked' if necessary to prevent inadvertent movement. The first phrase of Section 3314(c) – which requires that 'machinery and equipment capable of movement shall be stopped and the power source de-energized or disengaged' – is still applicable to prevent the movement of equipment during servicing, regardless of whether such movement was intentional or inadvertent. Indeed, Section 3314(c)(1), which Appellant relies upon here as an affirmative defense to Section 3314(c), contemplates situations where Employers must provide other methods to protect employees when machinery must be moving during servicing."

As to CalOSHA's first interpretive point, the regulation speaks for itself: "Machinery or equipment capable of movement shall be stopped and the power source de-energized or disengaged, and, if necessary, the moveable parts shall be mechanically blocked or locked out to prevent inadvertent movement, or release of stored energy during cleaning, servicing and adjusting operations." (§ 3314, subd. (c).) The point is to prevent inadvertent movement that may harm employees. Movement that an employee *intends*, either because it is necessary to complete or assess the efficacy of repairs, or because the employee has made an error of judgment, is not implicated. As for CalOSHA's point that movement is contemplated in the exception, section 3314, subdivision (c)(1), we fail to see how that alters the regulation itself, which covers unwanted movement. And as ThyssenKrupp replies, an employer cannot violate an exception; it can only fail to satisfy it.

Further, as for the exception to the regulation, the Board dismissed ThyssenKrupp's training because Harrell acted contrary to that training. The Board found "despite the training claims [ThyssenKrupp] made, the injured employee was position above the gap created by the removed step, rather than below it, as was the appropriate practice" and found "even if the injured employee had been trained about where to stand in relation to the gap created by the removed stair, he did not heed that

25

training." This finding--which posits that an employee's violation of safety rules he was taught necessarily shows the training is inadequate--is not supported by the record.

The exception to the cited rule provides that if machinery must be moving for an employee to complete work, "the employer shall minimize the hazard by providing and requiring the use of extension tools (eg., extended swabs, brushes, scrapers) *or other methods or means to protect employees from injury due to such movement*. Employees shall be made familiar with the safe use and maintenance of such tools, methods or means, by thorough training." (§ 3314, subd. (c)(1), italics added.) ThyssenKrupp persuasively contends the evidence shows it provided adequate "other methods or means" to "minimize"--not to *guarantee*--the safety of its workers.

CalOSHA's own witness, Weiss, conceded ThyssenKrupp had not been faulted for any failure of training on lockout/tagout procedures. ThyssenKrupp witnesses consistently described ThyssenKrupp's training, and ThyssenKrupp's written escalator safety manual (Exhibit E) clearly stated that a gap should be kept in front of a worker, and that a worker should not be on the escalator when it is started. Harrell testified he had been trained on that rule and considered it common sense. He testified the purpose of this rule was to keep the gap in front to see where it is going, so "you're not slipping in the hole that's behind you." Harrell did not keep the gap in front of him and did, in fact, slip. He admitted that if indeed his foot was on an escalator step, instead of the landing, he violated ThyssenKrupp's safety rules. Moore testified he rides a minimum two steps behind an escalator gap, and had been trained on the rules against standing on an escalator when it is starting, and the need to ride below an open step. Nicholson testified Harrell evidently violated ThyssenKrupp's safety rules and should have been standing on the landing; further, he should have kept the escalator gap in front of himself, not

26

behind.**7** Karosas concluded Harrell placed one foot on the top step, not on the landing, when he activated the escalator. Brandley testified there was no reason for Harrell to have his foot on the top step before starting the escalator. Brandley had presented a safety class that Harrell had attended, covering rules about riding behind an opening. In his view, Harrell violated company policy both by having his foot in an unsafe place and not having the gap in front of him. Nor did Harrell contest the formal discipline he was given for violating safety policies. Finally, Brandley testified that on the day of the accident Harrell admitted "I screwed up, Rob. I'm sorry."

None of this evidence was contradicted by any of CalOSHA's evidence. Although the Board was not required to credit any particular witness, it is our duty to review the entire record, in context, to see if credible, solid evidence supports the Board's finding. Given (1) the lack of any evidence that ThyssenKrupp's safety training was inadequate; (2) the clear directives in ThyssenKrupp's written safety manual *not* to start an escalator with a person on it and to ride with a gap in front of a worker; (3) the fact that both workers on the jobsite understood the rule; and (4) the clear evidence that Harrell violated ThyssenKrupp's rules, we cannot say the record shows substantial evidence to support the Board's finding.

As indicated above, the Board's reasoning was that because Harrell violated procedures, he was not property trained, but we disagree with this logic. The mere fact an employee violates a safety rule does not mean the rule is inadequate or that the employee was not properly trained on the rule. In *this* case, the evidence showed Harrell knew and understood the rule, and simply had a momentary lapse of reason. No amount of training can preclude such a lapse. (See, e.g., *In re Tri-Valley Growers* (Cal. OSHA, Aug. 15, 1990, No. 89-R2D5-173) CA OSHA App.Bd. Lexis 14 [reversing ALJ finding

---

**7** Nicholson did testify he would have started the escalator from the bottom, not the top, but did not testify that was necessary, only that it was a "personal preference."

27

of a section 3314 violation where the employee was experienced and properly trained in use of extension tools and had even been reprimanded for violating safety rules]; *In re Contadina Foods, Inc.* (Cal. OSHA, Nov. 30, 1978, No. 77-R2D5-977) CA OSHA App.Bd. Lexis 17 [somewhat similar facts, the "action of the injured employee was an unforeseeable act"].)

CalOSHA and the Board also suggest that because of the lockout violation shown in count 1, ThyssenKrupp could not establish adequate training as to count 2. This bootstrapping of one violation into two is not persuasive, as each addresses different points and involves different elements, as we have explained above.

CalOSHA also contends the employees could have replaced the step before running the escalator, as Weiss at one point suggested. However, while this was *possible*, Weiss had no experience in escalator repair, and the evidence and common sense shows this was not feasible. Fixing the tension required repeatedly making adjustments and running the escalator to see if the problem was resolved. Having to reinstall the step would require removing the step and repositioning the gap to the proper point each time, a burdensome and unnecessary process, given the rules and training the men received.

Accordingly, both because there was no inadvertent movement of the escalator, only an unintended and very unfortunate consequence to its intended movement, and because CalOSHA provided no substantial evidence that ThyssenKrupp should have done *more* to minimize risk, no substantial evidence supports count 2. The citation alleging a violation of section 3314, subd. (c) must be dismissed.

V

*Removal of Guards*

Count 3 cited ThyssenKrupp for violating section 4002, subd. (a), which provides as follows:

28

"All machines, parts of machines, or component parts of machines which create hazardous revolving, reciprocating, running, shearing, punching, pressing, squeezing, drawing, cutting, rolling, mixing or similar action, including pinch points and shear points, not guarded by the frame of the machine(s) or by location, shall be guarded."

ThyssenKrupp contends section 4002, subd. (a) applies to the ordinary condition of machinery, not machinery that is partly dismantled while in the process of maintenance and repair, and points out that section 4002 appears in a different part of the regulations than section 3314. The Board rejected this view because it "ignores the point that the escalator was operating at the time of the injury, and was set in motion deliberately." The trial court agreed with this view. We do not.

As a matter of common sense, a mechanic often must disassemble parts of a machine to replace a defective component or access an area in need of maintenance. This may require the mechanic to remove protective guards precisely because those guards block a person from touching moving parts that may need replacement, adjustment, lubrication, and so forth. To interpret the section as penalizing the removal of protective guards other than when the machines are operating normally would make repairs and maintenance of many machines impossible or impracticable.

Instead, the mechanic is protected by other provisions when working on partly disassembled machinery. This includes section 3314, subd. (c)(1), which, as discussed in Part III, *ante*, requires that the hazard of *necessary movement* during repairs shall be minimized "by providing and requiring the use of extension tools (eg., extended swabs, brushes, scrapers) or other methods or means to protect employees from injury due to such movement." There is also a regulation requiring lubrication points to be guarded when lubrication must be performed during operation of the machinery. (§ 3945.)[8] This rule, too, recognizes that some repairs must be made when the machine is operating.

_____

[8] In full, that section provides: "(a) Where lubrication must be performed while the machine is operating, openings with hinged or sliding covers shall be provided. [¶] (b)

29

These two provisions (i.e., §§ 3314, subd. (c)(1) & 3945) implement the common-sense view that *sometimes* a machine must be in use while it is being worked on, and these provisions explain how an employer must ensure worker safety in such circumstances.

Further, as ThyssenKrupp notes, section 3314 occurs in "Group 2" of Subchapter 7 of Chapter 4 of Division 1 of Title 8 of the regulations, entitled "Safe Practices and Personal Protection," specifically, in Article 7, entitled "Miscellaneous Safe Practices." But section 4002 is found in "Group 6" of Subchapter 7, entitled "Power Transmission Equipment, Prime Movers, Machines and Machine Parts," specifically, in Article 41, entitled "Prime Movers and Machinery." It seems logical that by their location in different groups within Subchapter 7 (entitled "General Industry Safety Orders"), these regulations were designed to address different subject matters.

The Board's interpretation of section 4002, subd. (a)--carried to its extreme-- would require all machines to be made so that they could be repaired or maintained without needing any protective parts to be removed. If that were the case, sections 3314 and 3945 would be superfluous. Instead, as ThyssenKrupp maintains, section 4002, subd. (a) means protective parts (guards) cannot be removed during ordinary operation of machinery, not that they cannot be removed during periods of repair, adjustment, or necessary maintenance.

We observe that, as adopted in 1974, section 4002 provided: " 'Hazardous revolving or reciprocating parts in any machine not guarded by the frame of the machine or by location shall be guarded.' " (*Garcia v. Becker Bros. Steel Co.* (2011) 194

---

Where machines or machine parts must be lubricated while in motion the lubricant fittings shall be located at least 12 inches from the dangerous moving parts unless such parts are guarded and the fittings are piped outside the guard. [¶] (c) Transmission equipment, machines and machine parts in inaccessible locations, which are lubricated while they are in motion shall be equipped with extension lubricant fittings or other methods of lubrication which can be serviced from an accessible location." (§ 3945.)

Cal.App.4th 474, 477, fn. 2.)  Plainly, this refers to the basic structure of the equipment, not to equipment partly dismantled for repairs or servicing.  That language was expanded into what is now section 4002, subd. (a), quoted above, in 1982.  (*Id*. at p. 478, fn. 4.) We find no indication in the longer, current version of the regulation that a broader reach was intended, that is, that the section was intended to do other than address the danger of moving equipment parts in ordinary usage, not during repairs.  "It is clear from a reading of the section that its intent is general in nature, i.e., there is a concern for protection against 'hazardous revolving or reciprocating parts.' "  (*In re Star-Kist Foods, Inc*. (Cal. OSHA, Feb. 17, 1977, Nos. 75-R4D3-795-801, 829) CA OSHA App.Bd. Lexis 53; see *In re A. Teichert & Son, Inc*. (Cal. OSHA, Oct. 6, 2011, Nos. 04-R5D1-0850, 0851) CA OSHA App.Bd. Lexis 164 ["Here, the hazard addressed by (section 4002(a)) is injury to employees who come in to contact with non-point-of-operation movement hazards of a machine"].)[9]

We find further support for our view in two of the Board's prior decisions.

In one case, the Board rejected liability under section 4002, subd. (a) because "the evidence failed to establish that any employee of Delco-Remy was ever likely to be exposed to the allegedly hazardous operation.  Uncontradicted testimony was offered *that the only time employees of Delco-Remy would be exposed to the machines in question was when a malfunction had occurred*.  In such an instance, the operation of the machines was stopped, thereby effectively preventing any exposure to the allegedly

---

[9]  For example, in *Perez v. VAS S.p.A* (2010) 188 Cal.App.4th 658, an injured worker's theory of liability against a manufacturer was that it designed a machine with an unguarded "pinch point" or "nip point" consisting of two rollers, into which the worker's hand was caught, and that such lack of a guard was negligence per se because it violated section 4002, subd. (a); indeed, CalOSHA had cited the employer under that section.  (*Id*. at pp. 663-664, 669.)  In other words, the tort theory was that *during normal operation*, the machine created a hazard to the employee.  However, on the facts of that case, the appellate court upheld the trial court's finding that the employer's failure to train the employee was a superseding cause of the employee's injury.  (*Id*. at pp. 682-685.)

hazardous reciprocating parts." (*In re Delco-Remy Div. of General Motors Corp.* (Cal. OSHA, Dec. 1, 1977, Nos. 75-R5D2-110, 544, 545) CA OSHA App.Bd. Lexis 23, italics added.) In other words, the workers in that case were exposed to harm only while addressing a malfunction, during which time the protections of section 3314 applied to ensure safety.

In contrast, in a case where fan blades in an engine compartment were not guarded at all, but were accessible during anticipated use by workers, the workers had *no* protections from the moving blades, even though they had not removed any protective part. In such circumstances, the Board reversed an ALJ ruling dismissing a section 4002, subd. (a) citation, as follows: "The injured employee was assigned to repair the starter mechanism on the crane. *Reaching in to the engine compartment to start the motor was part of the assigned work. No guard surrounded the fan portion of the machinery so as to prevent inadvertent contact of an employee's hand.* The starter override mechanism was located inside the engine compartment, and its use necessarily brought anyone using it in to the zone of danger of the unguarded fan." (*In re C.A. Rasmussen, Inc.* (Cal. OSHA, July 19, 2012, No. 08-R4D5-0219, 0220) CA OSHA App.Bd. Lexis 74, italics added.)

Here, in contrast, the danger of moving parts was avoidable by proper application of lockout/tagout requirements, and by training as to where the employees should stand with respect to the removed step. This was not a case where the machinery was inherently dangerous for lack of guards during normal operation.[10]

---

[10] ThyssenKrupp contends--and the Board at one point concedes--that there is no evidence a device exists that could have guarded the moving parts during the repairs. Indeed, the Board's decision accepted the view that there was no way to guard the gap, although it purported to limit this finding to "penalty correction." We fail to see how a fact can be true for one purpose but not another. On appeal the Board--though not CalOSHA-- points to testimony that a clear step might be used. But Weiss had no experience in escalator repair, and did not know whether any such clear step existed.

In short, we agree with ThyssenKrupp that no violation of section 4002 was proven, and therefore count 3 must be dismissed.

## DISPOSITION

The judgment is reversed and remanded with directions to the trial court to prepare a new judgment partly granting ThyssenKrupp's petition, consistent with this opinion. The parties shall bear their own costs on appeal.  (See Cal. Rules of Court, rule 8.278(a)(3).)

        /s/

Duarte, J.

We concur:

      /s/

Robie, Acting P. J.

      /s/

Murray, J.

---

Nicholson testified that *if* a clear step were used, it would have to be exactly the size and shape of the removed step, he did not testify such a step existed.  As we said in a prior case: "Where an expert bases his conclusion upon assumptions which are not supported by the record, upon matters which are not reasonably relied upon by other experts, or upon factors which are speculative, remote or conjectural, then his conclusion has no evidentiary value."  (*Pacific Gas & Electric Co. v. Zuckerman* (1987) 189 Cal.App.3d 1113, 1135.)  The speculations about a clear step are not solid, credible evidence.  In any event, we find section 4000, subd. (a) does not apply during mechanical repairs.